## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| LEWIS CONTRACTING SERVICES, LLC, a Georgia Limited Liability Company, | § § § | |
| | § | |
| Defendants. | § | |

---

## COMPLAINT

**PNC BANK, NATIONAL ASSOCIATION**, through its undersigned counsel, hereby sues **LEWIS CONTRACTING SERVICES, LLC** for enforcement of a commercial credit card agreement, and alleges as follows:

### PARTIES

1.      Plaintiff **PNC BANK, NATIONAL ASSOCIATION** ("**Plaintiff**" or "**PNC Bank**"), successor-in-interest to BBVA USA[1], is a national banking association. "All national banking associations shall, for purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located." 28 U.S.C. § 1348. PNC Bank's main office, as designated in its articles of association, is located in Delaware. Thus, PNC Bank is a citizen of

---

[1] "Plaintiff" and "PNC Bank" refers to both PNC Bank, National Association and its predecessor-in-interest – BBVA USA – interchangeably.

Delaware. Plaintiff is the owner and holder of the commercial credit card agreement made the basis of this lawsuit.

2.      Defendant **LEWIS CONTRACTING SERVICES, LLC** ("**Lewis Contracting**," "**Borrower**," or "**Defendant**") is a limited liability company made up of one member, James Lewis, who is domiciled in Conyers, Georgia. Thus, Lewis Contracting is a citizen of Georgia. Defendant Lewis Contracting is the Borrower of the indebtedness made the basis of this dispute.

## JURISDICTION

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of Delaware and a citizen of Georgia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that the Defendant resides in this district.

## FACTS

5.      On or about June 11, 2020, Lewis Contracting Services, LLC executed and delivered to PNC Bank the Commercial Credit Card Agreement (the "P-Card Agreement") evidencing Lewis Contracting's agreement to the terms and conditions contained therein in exchange for a commercial credit card with an original credit limit of $300,000.00 (the "Loan"). Attached hereto as Exhibit "A" is a true and correct copy of the P-Card Agreement.

6.      Plaintiff, PNC Bank, is the beneficial owner and holder of the P-Card Agreement (the "Agreement").

2

7.      Defendants defaulted on the Loan by failing to timely make the principal and interest payments when due under the Agreement, and failing to make full and final payment on or before the July 31, 2022 maturity date (the "Maturity Date").

8.      On or about October 6, 2022, PNC Bank sent Lewis Contracting a notice of default regarding the payment and maturity defaults under the subject P-Card Agreement, demanding the immediate payment of all outstanding amounts due on or before October 17, 2022 (the "October 2022 Demand Letter"). Attached hereto as Exhibit "B" is a true and correct copy of the October 2022 Demand Letter.

9.      The amounts outstanding under the P-Card Agreement were not paid in full by October 17, 2022.

10.     On or about August November 7, 2022, PNC Bank, by and through its undersigned counsel, sent Defendant a Notice of Default, Demand for Payment, and Reservation of Rights Letter informing Lewis Contracting that it is in default under the Agreement, and demanding that arrangements be immediately made to pay the outstanding balance under the P-Card Agreement. Attached hereto as Exhibit "C" is a true and correct copy of the November 7, 2022 demand letter (the "November 2022 Demand Letter").[2]

11.     Defendant Lewis Contracting has failed to pay the outstanding balance in response to the Demand Letters.

---

[2] The October 2022 Demand Letter and the November 2022 Demand Letter may be collectively, where appropriate, referred to as the "Demand Letters."

12.     As of February 22, 2023, the outstanding balance under the P-Card Agreement is $143,599.73.

13.     Further, pursuant to the Agreement, Defendant Lewis Contracting owes all expenses, including court costs and reasonable attorneys' fees, incurred by PNC Bank in enforcing the Agreement. See Ex. A, ¶ 21.

14.     All condition precedents have been performed, have occurred, or have been waived.

**COUNT ONE – BREACH OF P-CARD AGREEMENT**
**(As against Lewis Contracting Services, LLC)**

15.     PNC Bank repeats and re-alleges paragraphs 1 through 14 hereof, as if fully set forth herein.

16.     A contract exists between PNC Bank and Defendant Lewis Contracting, as evidenced by the P-Card Agreement. See Ex. A.

17.     PNC Bank is the beneficial owner and holder of the P-Card Agreement.

18.     Defendant Lewis Contracting is in material breach of the P-Card Agreement and has defaulted under its terms by, among other things, failing to timely pay all outstanding amounts due on or before the Maturity Date.

19.     As a direct and proximate result of Lewis Contracting's breach and default of the Agreement, PNC Bank has suffered damages and Lewis Contracting owes to PNC Bank that full amount of the outstanding balance.

20.     As a direct and proximate result of Lewis Contracting's breach and default of the Agreement, PNC Bank has been caused to incur expenses, including

costs and reasonable attorneys' fees, for which Lewis Contracting is obligated to pay under the terms of the Agreement.

**WHEREFORE**, Plaintiff, PNC Bank, demands judgment against Defendant Lewis Contracting for all amounts due and owing under the Agreement, together with reasonable attorneys' fees, costs, expenses, and for any other relief the Court deems just and proper.

**Dated:**          **February 24, 2023**

Respectfully submitted,

_/s/ Danielle E. Douglas_
Danielle E. Douglas (Ga. Bar No. 192316)
ADAMS AND REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, Alabama 3523
Telephone: (205) 250-5000
Facsimile: (205) 250-5034
E-mail: danielle.douglas@arlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this Friday, February 24, 2023, I have filed the forgoing using the CM/ECF system, and I have served the forgoing on the following parties by sending a copy via Certified Mail, Signature Required:

Lewis Contracting Services, LLC
Attn: Charlie Lewis
8584 Covington Highway
Lithonia, GA 30058

_/s/ Danielle E. Douglas_
OF COUNSEL

5

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| LEWIS CONTRACTING SERVICES, LLC, a Georgia Limited Liability Company, | § § § | |
| Defendants. | § | |

---

## COMPLAINT

---

# EXHIBIT A

**BBVA**

Creating Opportunities

**Commercial Card Agreement**

Company Name: _Lewis Contracting Services_ Date: _6/11/2020_

THIS COMMERCIAL CARD AGREEMENT (together with all exhibits, schedules and addenda hereto, this "Agreement") entered into as of the date set forth above by and between BBVA USA, an Alabama banking corporation (together with its successors and assigns, the "Bank") and the Company whose name is set forth above or on the signature hereto (the "Company"). This Agreement contains the terms and conditions under which the Bank will establish an Account (as defined below) and issue Card(s) (as defined below) to the Company.

1.  **Definitions.**

    a. Account means, individually or collectively, any and all accounts established by the Bank pursuant to this Agreement.

    b. Business Day means Monday through Friday, excluding federal holidays.

    c. Card means one or more cards or other devices (including an account number or virtual card) used to access the Account to obtain credit or conduct Transactions.

    d. Card Administrator means each individual properly designated by the Company pursuant to Section 5 to manage the Account for the Company.

    e. Cardholder means each Company employee, or other individual, to whom a Card is issued.

    f. Cash Advance means use of the Account or a Card to obtain cash from a financial institution, automated teller machine, or other location; to purchase money orders, traveler's checks, foreign currency, lottery tickets, casino chips, or similar items; to obtain wire transfers; to pay debts; or to make tax or other similar payments.

    g. Guarantor means those individuals, if any, who execute a guaranty of the obligations of the Company arising under this Agreement and those Persons or entities, if any, that otherwise guarantee the obligations of the Company arising under this Agreement.

    h. MCC means a Merchant Category Code, which is a code established, from time to time, by a Network. MCCs identify and classify goods or services that can be obtained by credit card. Each merchant designates its MCCs to the applicable Network.

    i. Network means, collectively, the Persons who govern commercial card issuance and processing, including, without limitation, Visa International Service Association, Visa U.S.A. Inc., Mastercard USA, and Mastercard International Incorporated.

    j. Person means any individual, corporation, company, limited liability company, general partnership, limited liability partnership, unincorporated association, trust, joint venture, estate or other entity, or any governmental body.

    k. Purchases means use of the Account or a Card to obtain goods and or services.

    l. Transaction means a Purchase or Cash Advance, as applicable.

2.  **Promise to Pay.** The Company agrees to pay the Bank all amounts due as provided in this Agreement.

3.  **Business Purposes.** The Company agrees that Cards and the Account shall be used by the Company and each Cardholder solely for business purposes (which does not include any personal, family, or household purpose), and the Company agrees to so advise each Cardholder. The Company's obligations under this Agreement, however, shall not be affected or limited if any balances are incurred for non-business purposes. The Company shall indemnify and hold harmless the Bank from any and all liability, loss, or expense, including attorney's fees, arising from or out of any violation or alleged

1

violation of the Truth-In-Lending Act or Regulation Z made or asserted against the Bank based upon any use of a Card or the Account for an alleged consumer purpose.

4.  **Cards.** The Bank may issue Cards at the Company's request. The Company authorizes and directs the Bank to issue renewal or replacement Cards on or before the expiration of each Card. The Bank reserves the right, in its sole discretion, to decline to issue a Card to any Person.

5.  **Card Administrator.** The Company may designate via the BBVA Commercial Card Company Setup Information form (the "Company Setup Information"), the online account management tool, or written notice one or more Card Administrators to manage the Account for the Company. The Company agrees that a Card Administrator is authorized to provide instructions on behalf of the Company, and any action taken by a Card Administrator in connection with the Account shall be binding on the Company. No change of a Card Administrator by the Company shall be effective until accepted by the Bank and the Bank has had a reasonable opportunity to update its records.

6.  **Account Management.** The Bank may provide the Company access to one or more Account management tools for administration, maintenance, and configuration of the Account by the Company. These tools may include an implementation workbook or Company Setup Information form, provided at Account opening or during the Account relationship, and an online account management tool. A tool may allow the Company to add, delete, or change Cardholders, monitor Card usage, and set limitations on Card usage by Transaction type, U.S. dollar amount, or frequency. The availability and functionality of each tool is solely in the Bank's discretion and may be changed at any time without prior notice to the Company and without any changes in the terms of this Agreement. Each Card Administrator's access to the online account management tool will be controlled by a user name and password (collectively referred to as "User Codes"). The Company agrees that use of User Codes and other security techniques that the Bank has established for the online account management tool constitutes a commercially reasonable security procedure for the Company. The Company agrees to protect, secure, and preserve the confidentiality of the User Codes and to be bound by all requests, communications, or other instructions to the Bank that are initiated through use of the online account management tool or otherwise under this Agreement and in compliance with the Bank's security procedures, regardless of whether the Company or any Card Administrator or other Person connected to the Company actually authorized the request, communication, or instruction. If any request, communication, or instruction initiated in connection with any Account and accepted by the Bank in compliance with this security procedure contains any error, to the fullest extent allowed by law, the Company will be liable for, and shall indemnify the Bank against, any claims, losses, and expenses the Bank may incur that arise from or relate to the erroneous requests, communications, or instructions. The Bank's records demonstrating compliance with this security procedure will be deemed conclusive proof that the request, communication, or instruction received by the Bank was authorized by the Company and that the Company is bound by the request, communication, or instruction. The Company agrees to advise each Cardholder of any limits the Company has placed on such Cardholder's Card.

The Bank may offer the Company the option to restrict the use of a Card to certain MCCs, by use of a tool or otherwise pursuant to procedures approved by the Bank. If the Company has selected this option, the Bank will take reasonable steps to decline to authorize Transactions unless the MCC for the merchant requesting authorization is among those authorized by the Company pursuant to such procedures. Transactions in an amount below certain floor limits will bypass the routine authorization process for Transaction approval. The Company agrees to accept full liability for any such Transactions.

7.  **Use of the Account.** Subject to the terms and conditions contained herein, Cards or the Account may be used for Purchases or Cash Advances. The Company agrees it will not, and will not permit any

2

Cardholder to, use any Card or the Account for any Transaction that is illegal in the jurisdiction where the Transaction is consummated or in any other jurisdiction affected by the Transaction. The Company agrees that it is the responsibility of the Company and each Cardholder to determine the legality of each Transaction in all applicable jurisdictions before entering into such Transaction. Display of the Visa, Mastercard, or any other logo by any Person accepting a Card does not indicate that the Transaction is legal in all applicable jurisdictions. The Company acknowledges and agrees that the Bank has no obligation to monitor, to review or to evaluate the legality of any Transactions. The Company also agrees that neither the Company nor any Cardholder will use a Card or the Account in connection with any internet or on-line gambling Transaction, whether or not gambling is legal in any applicable jurisdiction. The Bank reserves the right to decline any Transaction that the Bank believes is an illegal Transaction, an internet or on-line gambling Transaction, or a high-risk Transaction. To the fullest extent permitted by law, the Company agrees to pay for any Transaction by a Cardholder, even if that Transaction is determined to be illegal.

The Bank does not promise that all Persons will accept Cards. The Bank will not be responsible if any Person refuses to accept a Card or if any goods or services purchased with use of a Card are defective or unsatisfactory.  Neither the Bank nor its agents will be responsible or have any liability for refusing to authorize any Transaction, even if the Company has credit available.

8.     **Credit Limits.**  The Bank will establish a total credit limit for the Company's Account (the "Company Credit Limit"). The Bank may designate that only a portion of the Company Credit Limit is available for Cash Advances. If the Bank makes this designation, any reference in this Agreement to the Company Credit Limit shall be considered a reference to both the total credit limit and any limits on Cash Advances, unless otherwise specified. If the total Cash Advances charged to the Account exceed the designated limit on Cash Advances, the Company will be considered to have exceeded the Company Credit Limit for all purposes of this Agreement. At any time and in its sole discretion, the Bank may increase or decrease the Company Credit Limit to be effective immediately, whether in response to a request by the Company or otherwise. Such change shall not affect the Company's obligation to pay all amounts that the Company may owe under this Agreement.

The Company agrees to keep the outstanding balance on the Account (including fees) within the Company Credit Limit.  However, even if the Account balance exceeds the Company Credit Limit, this Agreement also will apply to that amount, and the Company agrees to pay that excess amount immediately. If the Bank honors Transactions or other requests for credit over the applicable Company Credit Limit on one or more occasions, it does not mean that the Bank must honor future overlimit requests.

9.     **Fees.** The Company agrees to pay the Bank the following fees:

a. **Late Fee:** If the Bank has not received payment in an amount equal to the New Balance shown on each monthly statement within seven (7) days of the Payment Due Date shown on such statement, the Bank may charge a late fee to the Account. The amount of the late fee is based on the amount of the New Balance shown on the monthly statement on which the late fee appears. The late fee will be the greater of $20.00 or one and one-half percent (1.5%) of such New Balance shown on the monthly statement.

b. **Cash Advance Fee:** For each Cash Advance, the Bank may charge a fee equal to three percent (3%) of the Cash Advance amount, or $5.00, whichever is greater. In addition to these fees that the Bank may charge, if a Card is used at an ATM, the owner or operator of that ATM may charge a fee for use of that ATM.

BBVA Commercial Card Agreement Rev. 08/2019

    c. **Foreign Transaction Fee:**  The Bank may charge the Company a foreign transaction fee if any Transaction or credit to the Account is not in U.S. dollars or occurs or is processed, in whole or in part, outside the U.S.  The foreign transaction fee will be one percent (1%) of the U.S. dollar amount of such Transaction or credit.

    d. **Additional Fees:** The Company agrees to pay such other additional fees as provided on a BBVA Commercial Card Fee Schedule or as otherwise agreed by the Company and the Bank from time to time.

10.      **Foreign Transactions.** If a Transaction is made in a currency other than U.S. dollars, the applicable Network will convert the amount of that Transaction into U.S. dollars according to its own currency conversion procedures in effect at that time.  The same conversion process and fee may apply if any foreign Transaction is reversed or credited back to that Account. The amount (in U.S. dollars) of any credit associated with a particular foreign Transaction on the Account is likely to differ from the original amount (in U.S. dollars) of the Transaction due to differences in the applicable exchange rates.

11.      **Monthly Statements.** The monthly statement reflects the Transactions, fees, payments, credits, and adjustments posted to the Account. The "New Balance" shown on the statement is the total amount the Company owes the Bank at the end of the billing cycle.

12.      **Payment.** The Company shall pay the Bank the New Balance in full by the "Payment Due Date" shown on each monthly statement. If the Company has authorized payment to the Bank by ACH debit, the Company agrees to maintain sufficient funds in the designated account to pay each "New Balance". All payments must be made in U.S. dollars. The Company agrees that the Bank may electronically present and represent items (such as checks and electronic debits) that are received by the Bank as payment on the Account, to the extent allowed by applicable law and clearinghouse rules. Subject to applicable law, the Bank reserves the right to allocate payments to the Account among fees, Transactions, and any other amounts due in any manner it chooses.  The Bank can accept late payments, partial payments, and checks or other items with restrictive endorsements without losing any of its rights under this Agreement.

13.      **Lost or Stolen Cards.**  In the event of the possible loss or theft of a Card or possible unauthorized use of the Account or any Card, the Company will notify the Bank immediately at the phone number provided for such notice on the monthly statement.  The Company shall be liable for all Transactions on a Card before the Bank is notified of the loss, theft, or possible unauthorized use of such Card. The Company agrees, in accordance with Section 135 of the Truth in Lending Act, that if at any time the Bank has issued ten (10) or more Cards for use by the Company's employees at the Company's request, then the Company waives any and all limitations on its liability for unauthorized use of such Cards that it may have under the Truth in Lending Act.  Otherwise, the Company's liability for Transactions by a Person who does not have actual, implied, or apparent authority to use the Card and whose use does not result in a direct or indirect benefit to the Company will not exceed $50.00 on each Card. The Company agrees to give the Bank and/or any law enforcement authority all reasonable assistance with any prosecution of unauthorized use, including without limitation, obtaining an affidavit or similar written, signed statement from the Cardholder. The Company will make every reasonable effort to recover a Card from any Person whose authority to use that Card the Company intends to terminate, or has terminated. The Company will cooperate in all legal action against any such Person, and in connection therewith, will promptly provide all available information, and will cause Company employees to testify.

14.      **Disputed Transactions.**  Disputed Transactions timely reported to the Bank at the address designated on the back of the monthly statement will be submitted and processed in accordance with the operating rules of the applicable Network, as may be in effect from time to time.  The report of a disputed Transaction must include: the names of the Company and the Cardholder, the Card number,

the dollar amount of the dispute or suspected error, the reference number for the questioned Transaction, and a brief description of the dispute or suspected error. If the Company does not notify the Bank within sixty (60) days from the monthly statement date, the Company waives any rights with respect to the disputed amount to the fullest extent permitted by law. The Bank may, but shall not be obligated to, provide provisional credit to the Company in connection with a disputed Transaction. At the Bank's election, the amount of any such provisional credit shall be due and payable to the Bank either (a) (i) upon notification that such funds were not recovered through the Network's dispute process or (ii) on the Payment Due Date listed on the monthly statement reflecting the Transaction, whichever is later; or (b) immediately, upon the occurrence of an Event of Default. A report of a disputed Transaction is not a guarantee of a refund. The Company shall not make a claim against the Bank or refuse to pay any amount because the Company or any Cardholder may have a dispute with any merchant as to the goods or services purchased from such merchant using a Card.

15. **Card Network Liability Program.** In its discretion, a Network may offer a program that provides coverage against employee misuse of the Card, subject to material conditions, limitations, and restrictions. The Company should consult the Network program brochure, which is available upon request from the Bank, for more information. The Company acknowledges that the Bank is not responsible for providing any form of liability protection program on the Company's behalf and that the Bank makes no representations or warranties regarding any such program that may be offered by the Network. In connection with a claim against the Network, the Bank agrees that it will not conduct collection efforts against such Cardholder in his or her individual capacity as a Cardholder (or any other individual solely because such individual has used a Card), regarding payment in connection with the Account or any Card.

16. **Cancellation of Cards.** If the Company at any time wishes to cancel any outstanding Card, a Card Administrator shall notify the Bank in writing of the requested action and the requested date of such action. Upon the cancellation of any Card, the Company promptly will notify the Cardholder and will use its best efforts to obtain the canceled Card and destroy the Card. Notwithstanding such cancellation of a Card the Company shall remain liable for all outstanding balances incurred by the use of such Card, including all outstanding balances for Transactions that may be posted to the Account after cancellation, as well as all fees or Transactions of any type with respect to such Card.

17. **Termination and Suspension of Account.** This Agreement may be terminated by the Bank at any time upon written notice to the Company. This Agreement may be terminated by the Company at any time upon written notice to the Bank. The Cards are property of the Bank, and, except as otherwise required by applicable law, the Bank may, without liability or notice to the Company or any individual Cardholder, suspend, revoke, or cancel all or any part of the privileges of the Account or any Card.

The Company remains liable for all obligations resulting from the use of the Account, even after the Bank or the Company receives written notice of termination. The Company also remains obligated to pay the Bank all amounts owed on the Account, including any amounts for which the Company has not yet been billed.

Notwithstanding any termination, the Company shall pay all amounts due on the Account according to the terms and conditions of this Agreement. Neither termination nor suspension of this Agreement or the Account will affect the Company's existing obligations or the Bank's rights or remedies under this Agreement, including the Bank's right to change the terms of this Agreement from time to time.

18. **Representations, Warranties and Covenants of the Company.**
   a. The Company represents and warrants to the Bank that: (i) the Company has the power and authority to execute, deliver, perform, and take all actions contemplated by this Agreement; (ii)

5

this Agreement has been duly executed and delivered by the Company and constitutes a valid, legal, and binding agreement of the Company enforceable against it in accordance with its terms; (iii) all information presented to the Bank in connection with this Agreement is true and complete; and (iv) all financial statements presented to the Bank fairly and accurately reflect the financial position and performance of the Company for the period(s) covered by those statements and conform with generally accepted accounting principles applied on a consistent basis throughout the periods involved.

b. The Company agrees to furnish to the Bank: (i) upon the Bank's request, such authorizations, verifications, and certificates as the Bank may require from time to time with respect to this Agreement; (ii) within ninety (90) days after the end of each fiscal year of the Company, audited financial statements of the Company certified by independent public accountants selected by Company and prepared in accordance with generally accepted accounting principles; and (iii) such other information regarding the current financial condition of the Company or any Guarantor as the Bank reasonably may request from time to time, including accurate and current information concerning the Company's assets and liabilities, income and expenses, and true copies of the Company's signed and filed federal and state income tax returns.

c. The Company shall: (i) notify the Bank within five (5) Business Days after the occurrence of any event which constitutes an Event of Default, and provide a statement of the details of such default and the action that the Company proposes to take with respect to that default; and (ii) notify the Bank promptly of the occurrence of any other event, condition, act, or fact that either would constitute a materially adverse change in, or otherwise would involve a substantial risk of a materially adverse effect on, the business, operations, finances, credit, any other condition, or prospects of the Company.

19. **Events of Default.** The occurrence of any of the following events will constitute an "Event of Default" under this Agreement:

a. The Company fails to pay the New Balance within seven (7) days of the applicable due date;

b. The Company or any Cardholder fails to abide by any other term of this Agreement;

c. The Company or any Guarantor defaults in the payment or performance of any other obligation to the Bank under any other agreement which is not cured within such applicable notice and cure periods provided therein;

d. The Company or any Guarantor defaults (whether as principal or as guarantor or other surety) in the payment on any obligation of $100,000 or more due to the Bank or any other creditor;

e. The Company or any Guarantor misrepresents any material fact in connection with the Account;

f. Any Guarantor purports in writing to revoke, terminate, or rescind the guaranty or any other documents executed by such Guarantor, or any provision thereof;

g. The Company or any entity Guarantor (i) fails to maintain its corporate, partnership, or other business existence in good standing, (ii) dissolves or otherwise ceases to operate; (iii) is a party to a merger or other reorganization; (iv) sells or otherwise transfers all or substantially all of its assets; or (v) permits the sale or transfer of a material ownership interest in the Company or such Guarantor, or otherwise materially changes or permits to be materially changed its organization or corporate or ownership structure;

h. Any Guarantor or any Person owning a majority interest in the Company dies, is declared legally incompetent, is imprisoned, or sells a majority of his, her, or its interest in the Company; or

i. The Company or any Guarantor (i) files a petition in bankruptcy; petitions or applies to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets; or commences any proceeding under any bankruptcy, dissolution or reorganization law or statute, or

6

any such petition or application or any such proceeding has been filed against it, and such petition or application or proceeding remains un-dismissed for a period of thirty (30) days or more; (ii) becomes insolvent or generally does not pay its debts as they become due or makes a general assignment for the benefit of creditors; (iii) has any substantial part of its property become subject to any levy, seizure, assignment, application for sale for or by any creditor or governmental agency; or (iv) suffers an adverse change in its financial condition which in the Bank's opinion will increase the Bank's risk or render its prospect of payment insecure.

20.     **Bank's Remedies.** Upon the occurrence of any one or more Events of Default, the Bank, at its option and without prior notification or demand, may: (a) reduce the Company Credit Limit; (b) close the Account; (c) declare the unpaid balance of the Account, together with all fees, expenses, and charges payable under this Agreement, immediately due and payable (provided, that upon the occurrence of an Event of Default under clause (i) of Section 19, the unpaid balance of the Account, together with all fees, expenses, and charges payable under this Agreement, shall become immediately due and payable without action of any kind by the Bank); (d) apply or set off any and all of the Company's monies, deposit balances (general or specific), securities, and other credit or property held by the Bank against all amounts due from the Company to the Bank under this Agreement; and/or (e) suspend, reduce, or terminate credit extensions to the Account.  The Company waives demand, presentment, notice of dishonor, protest, and suit.

21.     **Collection Charges.** The Company agrees to pay all reasonable expenses incurred by the Bank in collecting or attempting to collect the amounts that the Company owes the Bank under this Agreement, including court costs and reasonable attorneys' fees.

22.     **No Waiver.**  The Company agrees that the Bank may delay enforcing any of its rights under this Agreement without losing them. The fact that the Bank waives its rights in one or more instances does not constitute a waiver of the same or other rights in any other like or different instance. The remedies provided in this Agreement are cumulative and are not exclusive of any other rights or remedies provided by law. Without limiting the foregoing, and subject to applicable law, the Bank may, at its option: (a) accept late or partial payments; (b) agree to extend the due date of any payment due under this Agreement for any length of time; and/or (c) release any Guarantor, all without notifying the Company or any other Guarantor and without releasing the Company from its obligation to pay in full all amounts owing under this Agreement and to perform all of the Company's other obligations under this Agreement. To the extent allowed by applicable law, the Bank may take other action not described in this Agreement, and by doing so the Bank does not limit and will not lose its rights under this Agreement. The fact that the Bank may at any time honor a Transaction in excess of the applicable credit limit or at a time when the Account is in default does not obligate the Bank to do so again.

23.     **Security Interest and Right of Setoff.** The Company grants the Bank a continuing lien and security interest in and upon, as well as a right of setoff against, any and all monies, deposit accounts, securities, and other property of the Company now or hereafter held or received by the Bank or any of its affiliates, whether for safekeeping, pledge, custody, transmission, collection, or otherwise, as security for the Company's obligations and liabilities to the Bank and the Bank's claims against the Company arising out of or in connection with this Agreement, the Account, or any Card, in each case whether now existing or hereafter incurred, whether actual or contingent, and whether now or hereafter arising.  In addition, the Company agrees that any collateral securing other debt or obligations of the Company to the Bank will also secure such obligations and liabilities.

24.     **Limitation of Liability; Disclaimers.**  The Bank's duties and responsibilities are limited to those described in this Agreement. The Bank will be responsible for any loss sustained by the Company due to the Bank's breach of this Agreement only to the extent that such loss is caused by the Bank's gross

negligence or willful misconduct. In any case, liability will extend only to the resulting actual direct loss, and not to any incidental, consequential, punitive, lost revenue or profits, indirect, or special loss or damage. Further, the Bank will not be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by an act of God; acts of war; terrorism, fire, flood, or other catastrophe; electrical, computer, mechanical, utility, or telecommunications failures or fluctuations; acts or omissions by the Company or by third parties; or any other cause beyond the Bank's reasonable control. Any Account provided to the Company by the Bank is for the sole and exclusive benefit of the Company, and no third party shall have any rights or remedies arising out of or in connection with this Agreement.

EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE ACCOUNT, ALL CARDS, AND ANY ONLINE ACCOUNT MANAGEMENT OR ACCOUNTS PAYABLE TOOLS ARE PROVIDED FOR THE COMPANY'S USE DURING THE TERM HEREOF "AS IS" AND "WHERE IS", AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE BANK MAKES NO REPRESENTATIONS OR WARRANTIES AND DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, WITH REGARD TO THE ACCOUNT, ALL CARDS, AND ANY ONLINE ACCOUNT MANAGEMENT OR ACCOUNTS PAYABLE TOOLS, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY AND NON-INFRINGEMENT.

25. **Indemnification.** To the fullest extent permitted by law, the Company shall indemnify and hold harmless the Bank, its affiliates, and their respective directors, officers, employees and agents (each an "Indemnified Person"), from and against any and all losses, claims, damages, cost, expenses, liabilities, judgments, settlements, or other amounts, including reasonable attorneys' fees (collectively, "Losses") resulting from, relating to, or arising out of this Agreement, EVEN IF SUCH LOSSES ACTUALLY OR ALLEGEDLY ARISES FROM THE ORDINARY NEGLIGENCE OF ANY INDEMNIFIED PERSON; provided however, that the Company shall have no obligation to indemnify any Indemnified Person against any Losses to the extent that such Losses result from the gross negligence or willful misconduct of such Indemnified Person. The Company's indemnity obligations under this Section shall survive termination of this Agreement.

26. **Governing Law/Severability/General.** This Agreement and the Account, and any claim, dispute, or controversy arising from or relating to this Agreement, the Account, or any Card shall be governed by and construed in accordance with the laws of the state of Alabama (without regard to internal principles of conflicts of law) and applicable federal law.

If any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions will remain in full force and effect. This Agreement contains the entire agreement among the parties hereto relating to the Account and Transactions contemplated hereby, and supersedes any and all prior agreements, understandings, representations, and statements among the parties hereto, whether oral or written. The headings and captions contained in this Agreement are included only for convenience of reference and do not define, limit, explain, or modify this Agreement or its interpretation, construction, or meaning.

27. **Assignment/Binding Effect.** The Company agrees that at any time the Bank may assign or transfer the Account, this Agreement, and the Bank's rights and obligations under the Agreement to another Person without prior notice to or approval from the Company. The Company may not assign, delegate, or transfer the Account or any of the Company's obligations under this Agreement to any other Person without the prior written consent of the Bank. This Agreement shall be binding on the Company, its successors and assigns.

8

28. **Notices.** Except as otherwise provided for herein, all notices, requests, and other communications provided for hereunder must be directed to the other party at the respective addresses indicated in this Agreement and must be in writing and delivered (a) by first class mail, postage prepaid; (b) via facsimile with telephonic confirmation of receipt; (b) via e-mail with electronic or telephonic confirmation of receipt; (d) by overnight courier; or (e) by hand delivery. Delivery shall be deemed to have occurred within three days of mailing if sent by mail, on the date of confirmation if sent by facsimile or e-mail, or on the date of delivery if delivered by overnight courier or hand-delivered. Either party may, by notice to the other, change its address set forth in this Agreement. The Company must provide the Bank with both a mailing address and an email address. The Company shall notify the Bank within five (5) Business Days of any change in the Company's address, email address, or facsimile number.  The Company's address for notices is designated in the Company Setup Information.  The Bank's address for notices is:

> Mailing Address: BBVA USA
> Attn: Commercial Card Operations
> 15 20th Street South, Suite 1502
> Birmingham, AL 35233
>
> Email Address:  commercialcardservices.us@bbva.com
> Fax Number:  205-524-3489

29.    **Transactions with Bank Affiliates.** The Company shall not directly or indirectly (including through its parent company(ies), subsidiary(ies), or affiliate(s)) transfer any proceeds of a Transaction to, nor use the Account for the benefit of, a Bank Affiliate, including using the Account to make any payment on (or with respect to) any loan or other debt from any Bank Affiliate.  The Company may request a list of Bank Affiliates, which is updated on a quarterly basis, from the Bank by contacting the Bank. The term "Bank Affiliate" means any entity (a) that is directly or indirectly (including ownership through a trust and beneficial ownership), controlling, controlled by, or under common control with the Bank (such an entity a "Control Entity"); (b) in which a majority of its directors, trustees, or general partners (or individuals exercising similar functions) constitute a majority of the persons holding any such office with the Bank or a Control Entity; (c) that is sponsored and advised on a contractual basis by the Bank or another Bank Affiliate; or (d) that is (i) an investment company for which the Bank or any other Bank Affiliate serves as an investment adviser, as defined in section 2(a)(20) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)(20)), or (ii) an investment fund for which the Bank or another Bank Affiliate serves as an investment advisor, if the Bank and the other Bank Affiliates own or control in the aggregate more than five percent (5%) of any class of voting securities or of the equity capital of the fund (It being understood that the ownership of fifteen percent (15%) or more of the ownership interest in an entity shall be deemed control of the entity, and that each general partner shall have control over the partnership).

30.    **Amendments.** The Bank may amend this Agreement at any time by giving the Company thirty (30) days prior notice of the change. The Company agrees that, at the Bank's option, notice of change in terms includes electronic delivery of a notice informing the Company of the change, with the thirty (30) day notice period beginning to run upon the delivery of the electronic notice to the Company at the Company's email address on file with the Bank or by making such notice available on the Bank's website or online account management tool. Subject to the requirements of applicable law, any changes to this Agreement will apply to any outstanding Account balances on the effective date of the change, as well as new charges, unless the Company terminates all rights to use the Account on or before the date provided in the Bank's notice. The Company's use of the Account after the thirty (30) day notice period without written objection will be deemed acceptance of the amendments.  Except as set forth above, no change

to any term or condition of this Agreement shall be effective unless accepted or authorized by the Bank in writing.

31. **Dispute Resolution; Jury Waiver.** At the Bank's option, any controversy or claim arising out of or relating to the Account, any Card, or other services provided under this Agreement shall be settled by arbitration at a location in the State of Alabama in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof. This agreement to arbitrate shall be specifically enforceable under applicable law in any court of competent jurisdiction. Unless specifically waived in writing, the Bank shall not be deemed to have waived its right to compel arbitration hereunder by institution legal action or taking any other action. The Company submits to jurisdiction in the State of Alabama for any action or cause of action arising out of the Account, any Card or this Agreement, and agrees that venue shall be in a county selected by the Bank.

ALL PARTIES HERETO HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THE ACCOUNT, ANY CARD OR THIS AGREEMENT.

32. **Alerts.** From time to time, the Bank may provide fraud or other notifications ("Alerts") to the Company and/or Cardholders (the "Alerts Service"). The Bank may add new Alerts or discontinue existing Alerts at any time. According to availability, permissions, and a Cardholder's Alert selections, Alerts may be sent via phone, fax, e-mail, wireless device text, in-app notifications, push notifications, or via a combination of these delivery channels.

It is the Card Administrator's and Cardholders' sole responsibility to ensure that the email addresses and mobile numbers provided to the Bank are current and accurate. If information from a Person's wireless carrier or third party provider indicates to the Bank that the mobile number provided to the Bank by such Person has been changed, changed networks, is no longer registered to such Person, or is otherwise not authorized or able to receive messages, the Bank may automatically stop delivery of any Alerts to that number. In that event, the applicable mobile number before Alerts can be delivered to such mobile number again.

The Bank shall not be liable to the Company or any Cardholder FOR ANY DAMAGES INCURRED for its failure to provide the Alerts Service.

33. **Optional Services.** This Section applies to the Company if it uses an online accounts payable tool provided by the Bank.

   a. Accounts Payable Tool. If the Company elects to make Purchases through any online accounts payable tool, virtual Card numbers will be generated and provided to Suppliers in order to process the Transaction. To the extent that Company is now, or at any time becomes, a party to the BBVA Treasury Management Services Agreement (the "Services Agreement"), the terms of the Services Agreement will also apply to the Company's use of the accounts payable tool. At any time in which the Company is not a party to the Services Agreement, the terms governing the accounts payable tool in Exhibit A to this Agreement will also apply to the Company's use of the accounts payable tool.

   b. Virtual Cards. Virtual Cards may be assigned a maximum dollar amount limit, and suppliers or merchants may have the ability to process multiple Transactions using a virtual Card up to the maximum U.S. dollar limit on such Card unless Exact Pay$^{SM}$ has been established. Exact Pay will only permit a supplier or merchant to process a single Transaction for the exact U.S. dollar amount set for such Card.

c. <u>Buyer Initiated Payments</u>.  The Buyer Initiated Payments ("BIP") option allows the Company to initiate payments to a supplier as a virtual Card Transaction, with the Transaction amount sent directly to the supplier's bank account.  BIP requires additional analysis and set-up by the Bank and will be authorized by the Company and supplier.  As a condition of using BIP, the Company agrees to irrevocably waive any and all chargeback or dispute rights it may have on any Transaction made using the BIP option.

d. <u>Vendor Phone & Web Portal Payments</u>.  The Vendor Phone & Web Portal Payments option is a service provided by the Bank in which certain Transactions identified and agreed upon by the Bank and the Company submitted by the Company through the online accounts payable tool to be initiated by Bank via telephone or internet portal on behalf of the Company.  If this option is selected, the Company will be responsible for providing "Account Identifier Information" (which may include, but is not limited to, user name, password, web address, phone number, or account or invoice number) to the Bank for use in initiating such payments.  The Company shall be solely responsible for the accuracy of all Account Identifier Information.  If any Person other than the Bank has been provided or has access to the Account Identifier Information, the Bank will not be responsible for any Transactions or actions initiated by any such Person's use of or failure to maintain the confidentiality of the Account Identifier Information.

34. **Rewards Program.**  This Section applies to the Company if it is enrolled in the BBVA Corporate Rewards Program (the "Program"). The Program Terms and Conditions are available at https://www.bbvausa.com/content/dam/bbva/usa/en/pdf/creditcards/BBVACorporateRewardsProgramT-C.pdf or otherwise on the Program website. As part of the Program, the Company accepts and agrees to the Program Terms and Conditions. The Bank reserves the right, in its sole discretion, to terminate or temporarily suspend the Program or to modify, amend, or change the Program rules, benefits, or Rewards Points levels, in whole or in part, at any time with or without notice, even though changes may affect the ability to use accumulated Rewards Points or in the redemption of any outstanding rewards. The Company's continued participation in the Program after any change shall be deemed to be acceptance of any such change. Capitalized terms contained in this Section but not otherwise defined in this Agreement shall have the meanings given to such terms in the Program Terms and Conditions.

[Signatures appear on following page.]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date set forth at the beginning of this Agreement.

COMPANY: *Lewis Contracting Services, LLC*

By: _____
Name: Charlie B Lewis Jr.
Title: O.M.

**BBVA USA**

By: _____
Name: ADRIAN GARCIA
Title: PSSIVP

12



Exhibit A

Accounts Payable Tool

Upon the Company's submission of a request for the online accounts payable tool (referred to in this exhibit as the "Service") or upon its use of the Service, whichever occurs first, the Company agrees:

1.

**Definitions.** In addition to the capitalized terms defined elsewhere in this Agreement the terms below shall have the following meanings:

"Agreed Format" means the format of the file that the Company sends to the Bank which has been setup and tested by the Bank before the Payment File is sent.

"Corporate Administrator" means an individual designated by the Company who is responsible for designating the access of each Designated User within the Company to the Service. This person will be responsible for adding, deleting and maintaining the Designated Users.

"Designated User" refers to individuals who are given access to the Service by the Company's Corporate Administrator.

"Payee" or "Vendor" refers to the recipient of each payment in the payment file. A Payee must be a non-consumer (i.e. business) to access the Vendor Portal.

"Payee Number" is a unique number assigned by the Company to identify the Payee.

"Payment File" refers to a file containing one or more Payment Records sent by the Company to the Bank for processing.

"Payment Number" is assigned by the Company to each payment within their payment file. The number is used to facilitate payment reconciliation.

"Payment Record" means a detailed instruction to execute a payment and will include the amount, Payee name, Payment Number and other applicable information.

"Transmission Method" refers to the secure file transmission protocol, such as FTPS/SSL or SFTP/SSH, that may include the use of file encryption, public/private keys, passwords and/or digital authentication certificates, used by the Company to send Payment Files to the Bank. The specific transmission protocol and communication is established between the Company and the Bank during service implementation and must be set up before the first Payment File is transmitted to the Bank.

"Vendor Portal" refers to a self-enrollment website where Payees can complete online enrollment to create their user profile and provide the necessary information to receive electronic payments. Vendor data captured by the Vendor Portal may be stored in the Vendor Database. Enrolled Vendors receive payment notification via secure email and can access the Vendor Portal to view payments electronically. Vendors also have the ability to download payment and remittance details in an electronic data file.

"Virtual Token" refers to a unique one-time password generated for Designated Users each time they access the Integrated Payables system. It is used to prove one's identity electronically as a form of authentication. A text containing a password is sent to each Designated User's mobile telephone number or email address for every logon to Integrated Payables. Designated Users need to enter the 6-digit one-time use password that they receive to complete the logon process.

2. **Payment Processing.** The Company agrees to provide a Payment File to the Bank in the Agreed Format using the Integrated Payables website or Transmission Method. The Company is responsible for ensuring that any information or data which it introduces into the accounts payable tool is accurate, complete and fully authorized by the Company. The Bank will submit payments to vendors using data stored within the "Vendor Database", which may include information provided either by the Company or via the Vendor Portal. The Company is responsible for ensuring that any Vendor data introduced into the Vendor database is accurate, complete and fully authorized by the Company before submitting a Payment File. The Bank will send an automated email notification to the Company upon receipt of the Payment File. Each payment will be executed as a card transaction, settlement of each transaction is dependent upon the applicable Payee's merchant services.

3. **Payment File Specifications.** Payment File format will be mutually agreed to by the Company and the Bank. In the case of a custom format, the Bank may assess a charge for development required to support that format. Regardless of file format, the required data elements for each Payment Record are: (a) Payee Number, (b)Invoice Date, (c) Invoice Number and (d) Invoice Amount. The Company may optionally include remittance information such as descriptions, Payment Numbers, and additional invoice information associated with each Payment Record.

4. **Vendor Enrollment Campaign.** The Bank will design a custom vendor adoption campaign to enroll the Company's Vendors to receive payment via card transactions. The Bank and its Providers (as defined below) will contact the selected Vendors through formal mailings, proactive phone calls, emails and other methods as designated by the Company. The campaign may include providing invitations to Vendors to enroll via the Vendor Portal. The campaign will be executed by the Bank and/or its Providers with the approval of the Company, providing reasonable direct support to Payees requiring assistance in completing the online registration steps. Verified Vendor accounts will be activated in the system so that future payments to registered Vendors of Company will be fulfilled as card transactions.

5. **Internet Security.** The Company shall designate in writing to the Bank the Corporate Administrator to serve as its system and security administrator for the Service. The Corporate Administrator shall be responsible for (a) granting and revoking authority to Designated Users to access the Service and use the online accounts payable tool and (b) defining the scope of authority for each Designated User. After the Company has

designated to the bank the Corporate Administrator, the Bank will provide the Corporate Administrator with the World Wide Web address on which the Service shall be accessible. The Corporate Administrator shall set up each Designated User on the Service.

Each Designated User will be required to use a username and password (the "Security Codes") to access the Service. At the Company's option, use of Virtual Tokens may be required to gain access to the Service.

The Company agrees that use of the Security Codes (and, if applicable, Virtual Tokens) will authenticate the identity of the Corporate Administrator and each Designated User. The Company also agrees to review promptly each statement sent by the Bank for the Account and any Card that is accessible through the Service in order to detect any unauthorized transactions. To the fullest extent permitted by applicable law, the Company is responsible for all transactions on the Account or any Card initiated using the Security Codes (and, if applicable, Virtual Tokens). The Company is responsible for maintaining the confidentiality of all Security Codes (and, if applicable, Virtual Tokens), and for implementing the necessary internal controls, balancing and reconciliation functions, and audit procedures to prevent unauthorized use of the System. The Company agrees that the use of the Security Codes (and, if applicable, Virtual Tokens) constitutes a commercially reasonable security procedure for the Company. The Company also agrees to be bound by all requests, communications, or other instructions to the Bank that are initiated using the Service and in compliance with this security procedure, regardless of whether or not the Company actually authorized the transaction. If any instruction initiated through the Service and accepted by the Bank in compliance with this security procedure contains any error, to the fullest extent allowed by law, the Company shall be liable for, and shall indemnify the Bank against any claims, losses and expenses the Bank may incur that arises from or relates to the erroneous instructions. The Bank's records demonstrating compliance with this security procedure will be deemed conclusive proof that the instruction received by the Bank was authorized and that the Company is bound by those instructions.

6   **Grant of License.** The Bank hereby grants the Company a limited, nonexclusive, non-transferable, limited term, royalty free, revocable sublicense to use the online tool provided in connection with the Service, and the software creating, maintaining and supporting the online accounts payable tool (the "Software") and the printed, digital or electronic user materials provided in connection therewith (the "Documentation") solely for the Company's internal business purposes only. Except as specifically provided herein, the Bank does not grant to the Company any other right or license express or implied. The Company may not sublicense, sell, lease, distribute or provide access to the Software or Documentation to any third parties, nor use the Software or Documentation in a service bureau, time-sharing or other similar arrangement, nor make any other use of the Software or Documentation that is not expressly permitted hereunder. The Bank, BBVA Group or a third party are the exclusive owners of and shall retain all right, title and interest in and to the Software, the Documentation and the intellectual property rights pertaining thereto.

7   **Bank Representations and Warranties.** Subject to all terms of this Agreement, the Bank warrants that it has the right to grant the sublicense to the Software and Documentation in the event the Software or Documentation, or any portion thereof, is held to constitute an infringement of any third party's rights, and use thereof is enjoined, the Bank shall, at its election, (a) promptly procure the right for the Company, or (b) notify the Company of its intent to discontinue use of the Software and Documentation.

8   **Limitation of Liability; Indemnity.** Notwithstanding any other provision of this Agreement or any other agreement between the Bank and the Company, neither the Bank nor any of its suppliers, licensors, service providers or vendors (collectively the "Providers") shall have any liability for any liabilities, losses, damages, claims, judgments, costs or expenses (collectively, "Damages") that the Company asserts or sustains as a result of the Company's use of the Service.

9   **Proprietary Rights.** The Company acknowledges that the Bank or the other Providers shall retain all rights, title and interests in and to the Service, the Software (including, without limitation, the source code, listings, magnetic media and any support materials related thereto) and Documentation, as well as the ideas and concepts incorporated in those items, and all modifications, improvements and enhancements thereof, and add-ons thereto, including ownership in all trade secrets, copyrights and other associated proprietary and intellectual property rights pertaining thereto (collectively, the "Intellectual Property Rights"), except as granted hereunder. The Company shall not take any action that is inconsistent with the Intellectual Property Rights of the Bank or any Provider, nor shall it take any actions or engage in any conduct that violates the Intellectual Property Rights of the Bank or any other Provider.

The Software and Documentation include trade secrets and other proprietary information of the Bank and its suppliers, licensors, service providers and vendors and are confidential property of such person(s) or legal entity(ies). The Company shall treat as confidential and shall not disclose or otherwise make available the Software, the Documentation (collectively, the "Confidential Information"), in any form, to any person other than the Company's employees who have a need to know such Confidential Information. The Company shall not attempt to nor shall it reverse engineer, disassemble, decompile or otherwise attempt to derive source code from Confidential Information, make the Confidential Information available to any third parties, modify, adapt, translate or create derivative works based upon such Confidential Information, or permit or authorize any third party to do any of the foregoing. The Company will instruct its employees who have access to the Confidential Information to keep the same confidential, by using the same care and discretion which the Company uses with respect to its own confidential property and trade secrets. The Company agrees that it shall not take any action to change or make any modification to the Service or the Software.

10   **Termination.** Notwithstanding any other provision regarding termination set forth herein or in any other agreement between the Bank and the Company, the Bank may terminate the Company's access to and its ability to transact through the Service at any time, effective immediately. The Bank shall use reasonable efforts to communicate notice of the termination to the Company promptly, and will thereafter provide written confirmation of the termination if the initial notice of termination was not communicated in writing. The Bank may require the Company to execute additional documents or agreements to continue to conduct or transact through the Service at any time.

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| LEWIS CONTRACTING SERVICES, LLC, a Georgia Limited Liability Company, | § § § | |
| Defendants. | § | |

## COMPLAINT

# EXHIBIT B



October 6, 2022

**VIA OVERNIGHT MAIL**

Lewis Contracting Services, LLC
8584 Covington Highway
Lithonia, GA 30058-4260
Attention:       Charlie B. Lewis, Operations Manager

                    Re:      **Demand for Payment**

Dear Mr. Lewis:
lew
Please be advised that the Loan identified in Exhibit A attached hereto is in default due to the
Borrower's failure to make full and final payment on the July 31, 2022 maturity date.

Demand is hereby made upon the Borrower to repay the Loan in full in immediately available
funds at PNC Bank, National Association, 1075 Peachtree Street NE, Suite 1800, Atlanta, GA
30309, or by wire to the following:

                    Account Name: ██████████████
                    ABA/Routing Transit No.:   ████████████
                    Account No: ██████████
                    Field 6000 OBI: ███████████████

**on or before the 17th day of October, 2022**.  The total amount of principal, accrued interest, late
charges and reimbursable expenses owed by the Borrower to the Bank as of October 7, 2022 is set
forth on Exhibit A.     In addition to the unpaid principal, accrued interest, late charges and
reimbursable expenses, the Borrower is also required to pay all of the Bank's attorneys' fees,
collection costs, a pre-payment fee, if provided for in the Note, and all interest and late charges
which subsequently accrue in accordance with the terms of the Note and the other applicable loan
documentation.  Unless timely and full payment is received by the Bank, all remedies available to
the Bank under applicable laws will be pursued without further notice to you.

This letter is not intended to be a waiver of any rights, remedies or recourse available to the Bank,
nor an election of remedies arising as a result of the default or of any other default which may now
or hereafter exist with respect to the Note.  The collection of interest or acceptance of partial
payments (that is, less than the total amounts due in accordance with the terms of the Note) by the

Lewis Contracting Services, LLC
October 6, 2022
Page 2


Bank shall not constitute a waiver of the Bank's acceleration of the Loan or of any other rights of the Bank under the Note or the other loan documentation.

Please contact the undersigned to arrange for payment.

Very truly yours,

**PNC BANK, NATIONAL ASSOCIATION**

By: _____
    Jim White
    Vice President, Asset Manager

Cc:  Lewis Contracting Services, LLC, Guarantor
     Joshua Lewis, Esquire

Exhibit A

Loan (the "**Loan**") evidenced by a Commercial Card Agreement dated June 11, 2020 (as amended or modified, the "**Note**") made by Lewis Contracting Services, LLC (the "**Borrower**") to PNC Bank, National Association, successor to BBVA USA (the "**Bank**"), in the originally stated maximum principal amount of $300,000.00.

| | | |
|---|---|---|
| Principal: | $ | 161,345.98 |
| Late Charges: | $ | 2,420.18 |
| Total: | $ | 163,766.16 |

10/11/22, 9:11 AM                    https://pnc.transtream.com/Composer/XmlRequest/GetShipLabel?guid=8a66b1f0-35a6-4c43-914d-fa385479ca67&pagenumber…



ORIGIN ID:QFEA   (404) 495-6252
JAMES WHITE
PNC BANK
1075 PEACHTREE ST NE
GA-MQFA-19-2
ATLANTA, GA 30309
UNITED STATES US

TO   MR. CHARLIE LEWIS
     LEWIS CONTRACTING SERVICES, LLC
     8584 COVINGTON HWY

     LITHONIA GA 30058
     (404) 557-7611

SHIP DATE: 11OCT22
ACTWGT: 10.44 LB
CAD: 2512720064/WSXI3600

BILL SENDER

REF: 0000100117650
DEPT:

TRK#  0201   2789 9164 5872

37 MULA

WED - 12 OCT 4:30P
STANDARD OVERNIGHT

30058
ATL
GA-US

FedEx Express

REL #
3785346

581J1/AC5F/FE2D

J223022001201wv

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| LEWIS CONTRACTING SERVICES, LLC, a Georgia Limited Liability Company, | § § § | |
| Defendants. | § | |

## COMPLAINT

# EXHIBIT C



**Attorneys at Law**
**Alabama**
Colorado
Florida
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Tennessee
Texas
Washington, DC

November 7, 2022

**Notice of Default, Demand for**
**Payment, and Reservation of Rights**

**Danielle E. Douglas**
Direct:  205.250.5024
E-Fax:  205.488.8024
danielle.douglas@arlaw.com

**VIA FEDEX, SIGNATURE REQUIRED**

Lewis Contracting Services, Inc.
As Borrower
Attn: Charlie Lewis
8584 Covington Highway
Lithonia, GA 30058

Re:   Payment default by Lewis Contracting Services, Inc. as Borrower ("Borrower")
under that certain Commercial Card Agreement dated June 11, 2020.

Dear Borrower:

We write on behalf of PNC Bank, National Association, successor-in-interest to BBVA USA ("PNC").  This is notice of Borrower's default under that certain Commercial Card Program Agreement dated June 11, 2020 (the "P-Card Agreement"). The P-Card Agreement, and all amendments, schedules, exhibits, forbearances, addendums and other documents and agreements thereto, are collectively referred to herein as the "Loan Documents."

This letter is notice to the Borrower that certain Events of Default have occurred under the Loan Documents as a result of Borrower's failure to pay the balance due and owing under the Loan Documents (the "Notice"). Demand was made upon Borrower by PNC on October 6, 2022 that all amounts outstanding under the P-Card Agreement be paid in full no later than October 17, 2022. Unfortunately, all amounts outstanding under the P-Card Agreement have still not been paid (the "Existing Default").

As of November 7th, 2022, the outstanding amounts due was $163,766.16, including $161,345.98 in outstanding principal and $2,420.18 in late fees. **Demand is hereby made on Borrower for the immediate payment of these amounts to PNC**. You will receive no further Notice before PNC takes legal action against you if arrangements are not made for payment of the entire outstanding amounts due.

All rights and remedies of PNC under the Loan Documents, including, without limitation, all rights and remedies now or hereafter existing as a result of the Existing Default are expressly reserved.  Nothing in this letter, and no action or failure to act by PNC, including the acceptance of any partial payments, shall constitute, or be deemed or construed to constitute, a waiver, modification, or release by PNC of any right or remedy under the Loan Documents, or available at law or in equity, as against Borrowers, each of which rights and remedies are hereby expressly

reserved by PNC as aforesaid. PNC reserves the right to commence an action or actions against the Borrower pursuant to the consent to jurisdiction provisions of the Loan Documents.

Additionally, PNC continues to reserve all rights and remedies and may choose to exercise such rights and remedies under the Loan Documents at any time in the future without any further written notice to Borrowers. Such rights and remedies include, without limitation, seeking to collect the amounts owed under the Loan Documents, to commence appropriate judicial or non-judicial proceedings to protect its interest in any and all collateral securing Borrower's obligations to PNC, and to collect all of the attorneys' fees and costs that it incurs in connection with its collection efforts related to the Loan Documents to the full extent provided for in the Loan Documents and applicable law.

In light of the Existing Default, no forbearance, delay or inaction by PNC in the exercise of its rights and remedies, no payment or continuing performance by Borrowers in connection with or under the Loan Documents, and nothing in this Notice or any document executed prior to this Notice: (a) shall constitute (i) a modification or alteration of the terms, conditions or covenants of the Loan Documents, all of which remain in full force and effect, (ii) a waiver of any default or event of default resulting from the Existing Default or of any other default or event of default, if any, that may now or hereafter exist, (iii) a waiver, release or limitation upon the rights and remedies under, or of PNC's exercise of any of its rights and remedies under, the Loan Documents or applicable law, all of which are hereby expressly reserved, (iv) a modification or an alteration of the terms, conditions, or covenants of any of the Loan Documents, all of which remain in full force and effect; or (b) shall release Borrowers in any way from any of their respective duties, obligations, covenants or agreements under the Loan Documents.

PNC has not waived or granted any forbearance with respect to, and is not obligated to waive, or grant any forbearance with respect to, the Existing Default or any other default or event of default, whether now existing or that may occur after the date of this Notice. PNC reserves the right to require strict compliance with all terms of the Loan Documents. No conversations, e-mail messages or other written communications, or unwritten agreements or understandings will be binding on PNC or waive or modify any of the matters specified in this Notice or any of the Loan Documents or the rights and remedies under the Loan Documents.

Except as set forth above, PNC has chosen not to exercise each and every right and remedy under the Loan Documents at this time as a consequence of the above Event of Default, but may choose to do so at any time in the future without any further written notice to the Borrower.

Please govern yourselves accordingly, and contact the undersigned immediately upon your receipt of this correspondence to make arrangements to pay the total outstanding amounts due of $163,766.16.

Sincerely,

Danielle E. Douglas

2